527 U.S. 229 (1999)
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION et al.
v.
FEDERAL LABOR RELATIONS AUTHORITY et al.
No. 98-369.
United States Supreme Court.
Argued March 23, 1999.
Decided June 17, 1999.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
*230 Stevens, J., delivered the opinion of the Court, in which Kennedy, Souter, Ginsburg, and Breyer, JJ., joined. Thomas, J., filed a dissenting opinion, in which Rehnquist, C. J., and O'Connor and Scalia, JJ., joined, post, p. 246.
*231 David C. Frederick argued the cause for petitioners. With him on the brief were Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Underwood, William Kanter, and Howard S. Scher. 
David M. Smith argued the cause for respondent Federal Labor Relations Authority. With him on the brief was Ann M. Boehm. Stuart A. Kirsch argued the cause for respondent American Federation of Government Employees, AFL CIO. With him on the brief were Mark D. Roth, Jonathan P. Hiatt, James B. Coppess, and Laurence Gold.[*]
Justice Stevens, delivered the opinion of the Court.
On October 12, 1978, Congress enacted the Inspector General Act (IGA), 5 U. S. C. App. § 1 et seq., p. 1381, which created an Office of Inspector General (OIG) in each of several federal agencies, including the National Aeronautics and Space Administration (NASA). The following day, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U. S. C. § 7101 et seq., which provides certain protections, including union representation, to a variety of federal employees. The question presented by this case is whether an investigator employed in NASA's Office of Inspector General (NASAOIG) can be considered a "representative" of NASA when examining a NASA employee, such that the right to union representation in the FSLMRS may be invoked. § 7114(a)(2)(B). Although certain arguments of policy may support a negative answer to that question, the plain text of the two statutes, buttressed by administrative deference and Congress' countervailing policy concerns, dictates an affirmative answer.

I
In January 1993, in response to information supplied by the Federal Bureau of Investigation (FBI), NASA's OIG conducted *232 an investigation of certain threatening activities of an employee of the George C. Marshall Space Flight Center in Huntsville, Alabama, which is also a component of NASA. A NASAOIG investigator contacted the employee to arrange for an interview and, in response to the employee's request, agreed that both the employee's lawyer and union representative could attend. The conduct of the interview gave rise to a complaint by the union representative that the investigator had improperly limited his participation. The union filed a charge with the Federal Labor Relations Authority (Authority) alleging that NASA and its OIG had committed an unfair labor practice. See §§ 7116(a)(1), (8).
The Administrative Law Judge (ALJ) ruled for the union with respect to its complaint against NASAOIG. See App. to Pet. for Cert. 71a. The ALJ concluded that the OIG investigator was a "representative" of NASA within the meaning of § 7114(a)(2)(B), and that certain aspects of the investigator's behavior had violated the right to union representation under that section. Id., at 64a65a, 69a70a. On review, the Authority agreed that the NASAOIG investigator prevented the union representative from actively participating in the examination and (1) ordered both NASA and NASAOIG to cease and desist (a) requiring bargaining unit employees to participate in OIG interviews under § 7114(a)(2)(B) without allowing active participation of a union representative, and (b) likewise interfering with, coercing, or restraining employees in exercising their rights under the statute; and (2) directed NASA to (a) order NASAOIG to comply with § 7114(a)(2)(B), and (b) post appropriate notices at the Huntsville facility. NASA, 50 F. L. R. A. 601, 602, 609, 622-623 (1995).
NASA and NASAOIG petitioned for review, asking whether the NASAOIG investigator was a "representative" of NASA, and whether it was proper to grant relief against NASA as well as its OIG. The Court of Appeals upheld the Authority's rulings on both questions and granted the *233 Authority's application for enforcement of its order. 120 F. 3d 1208, 1215-1217 (CA11 1997). Because of disagreement among the Circuit Courts over the applicability of § 7114(a)(2)(B) in such circumstances, see FLRA v. United States Dept. of Justice, 137 F. 3d 683 (CA2 1997); United States Dept. of Justice v. FLRA, 39 F. 3d 361 (CADC 1994); Defense Criminal Investigative Serv. v. FLRA, 855 F. 2d 93 (CA3 1988), we granted certiorari. 525 U. S. 960 (1998).

II
The FSLMRS provides, in relevant part,
"(2) An exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at. . . . .
"(B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if
"(i) the employee reasonably believes that the examination may result in disciplinary action against the employee; and
"(ii) the employee requests representation." 5 U. S. C. § 7114(a).
In this case it is undisputed that the employee reasonably believed the investigation could result in discipline against him, that he requested union representation, that NASA is the relevant "agency," and that, if the provision applies, a violation of § 7114(a)(2)(B) occurred. The contested issue is whether a NASAOIG investigator can be considered a "representative" of NASA when conducting an employee examination covered by § 7114(a)(2)(B).
NASA and its OIG argue that, when § 7114(a)(2)(B) is read in context and compared with the similar right to union representation protected in the private sector by the National Labor Relations Act (NLRA), the term "representative" *234 refers only to a representative of agency management "i. e., the entity that has a collective bargaining relationship with the employee's union." Brief for Petitioners 13. Neither NASA nor NASAOIG has such a relationship with the employee's union at the Huntsville facility, see 5 U. S. C. § 7112(b)(7) (excluding certain agency investigators and auditors from "appropriate" bargaining units), and so the investigator in this case could not have been a "representative" of the relevant "entity."
By its terms, § 7114(a)(2)(B) is not limited to investigations conducted by certain "entit[ies]" within the agency in question. It simply refers to representatives of "the agency," which, all agree, means NASA. Cf. § 7114(a)(2) (referring to employees "in the unit" and an exclusive representative "of an appropriate unit in an agency"). Thus, relying on prior rulings, the Authority found no basis in the FSLMRS or its legislative history to support the limited reading advocated by NASA and its OIG. The Authority reasoned that adopting their proposal might erode the right by encouraging the use of investigative conduits outside the employee's bargaining unit, and would otherwise frustrate Congress' apparent policy of protecting certain federal employees when they are examined and justifiably fear disciplinary action. 50 F. L. R. A., at 615, and n. 12. That is, the risk to the employee is not necessarily related to which component of an agency conducts the examination. See App. to Pet. for Cert. 65a (information obtained by NASAOIG is referred to agency officials for administrative or disciplinary action).
In resolving this issue, the Authority was interpreting the statute Congress directed it to implement and administer. 5 U. S. C. § 7105. The Authority's conclusion is certainly consistent with the FSLMRS and, to the extent the statute and congressional intent are unclear, we may rely on the Authority's reasonable judgment. See Federal Employees v. Department of Interior, 526 U. S. 86, 98-100 (1999); Fort Stewart Schools v. FLRA, 495 U. S. 641, 644-645 (1990).
*235 Despite the text of the statute and the Authority's views, NASA and NASAOIG advance three reasons for their narrow reading. First, the language at issue is contained in a larger section addressing rights and duties related to collective bargaining; indeed, 5 U. S. C. § 7114 is entitled "Representation rights and duties." Thus, other subsections define the union's right to exclusive representation of employees in the bargaining unit, § 7114(a)(1); its right to participate in grievance proceedings, § 7114(a)(2)(A); and its right and duty to engage in good-faith collective bargaining with the agency, §§ 7114(a)(4), (b). That context helps explain why the right granted in § 7114(a)(2)(B) is limited to situations in which the employee "reasonably believes that the examination may result in disciplinary action"a condition restricting the right to union presence or participation in investigatory examinations that do not threaten the witness' employment. We find nothing in this context, however, suggesting that an examination that obviously presents the risk of employee discipline is nevertheless outside the coverage of the section because it is conducted by an investigator housed in one office of NASA rather than another. On this point, NASA's internal organization is irrelevant.
Second, the phrase "representative of the agency" is used in two other places in the FSLMRS where it may refer to representatives of agency management acting in their capacity as actual or prospective parties to a collectivebargaining agreement. One reference pertains to grievances, § 7114(a)(2)(A), and the other to the bargaining process itself, § 7103(a)(12) (defining "collective bargaining"). NASA and NASAOIG submit that the phrase at issue should ordinarily retain the same meaning wherever used in the same statute, and we agree. But even accepting NASA's and NASAOIG's characterization of §§ 7114(a)(2)(A) and 7103(a)(12), the fact that some "representative[s] of the agency" may perform functions relating to grievances and bargaining does not mean that other personnel who conduct *236 examinations covered by § 7114(a)(2)(B) are not also fairly characterized as agency "representative[s]." As an organization, an agency must rely on a variety of representatives to carry out its functions and, though acting in different capacities, each may be acting for, and on behalf of, the agency.
Third, NASA and NASAOIG assert that their narrow construction is supported by the history and purpose of § 7114(a)(2)(B). As is evident from statements by the author of the provision[1] as well as similar text in NLRB v. J. Weingarten, Inc., 420 U. S. 251 (1975), this section of the FSLMRS was patterned after that decision. In Weingarten, we upheld the National Labor Relations Board's conclusion that an employer's denial of an employee's request to have a union representative present at an investigatory interview, which the employee reasonably believed might result in disciplinary action, was an unfair labor practice. Id., at 252-253, 256. We reasoned that the Board's position was consistent with the employee's right under § 7 of the NLRA to engage in concerted activities. Id., at 260. Given that history, NASA and its OIG contend that the comparable provision in the FSLMRS should be limited to investigations by representatives of that part of agency management with responsibility for collectively bargaining with the employee's union.
This argument ignores the important difference between the text of the NLRA and the text of the FSLMRS. That the general protection afforded to employees by § 7 of the NLRA provided a sufficient basis for the Board's recognition of a novel right in the private sector, see id., at 260-262, *237 266-267, does not justify the conclusion that the text of the FSLMRSwhich expressly grants a comparable right to employees in the public sectorshould be narrowly construed to cover some, but not all, interviews conducted by agency representatives that have a disciplinary potential. Congress' specific endorsement of a Government employee's right to union representation by incorporating it in the text of the FSLMRS gives that right a different foundation than if it were merely the product of an agency's attempt to elaborate on a more general provision in light of broad statutory purposes.[2] The basis for the right to union representation in this context cannot compel the uncodified limitation proposed by NASA and its OIG.
Employing ordinary tools of statutory construction, in combination with the Authority's position on the matter, we have no difficulty concluding that § 7114(a)(2)(B) is not limited to agency investigators representing an "entity" that collectively bargains with the employee's union.

III
Much of the disagreement in this case involves the interplay between the FSLMRS and the IGA. On NASA's and NASAOIG's view, a proper understanding of the IGA precludes treating OIG personnel as "representative[s]" of the agencies they are duty-bound to audit and investigate. They add that the Authority has no congressional mandate or expertise with respect to the IGA, and thus we owe the Authority no deference on this score. It is unnecessary for us to defer, however, because a careful review of the relevant IGA provisions plainly favors the Authority's position.
*238 Section 2 of the IGA explains the purpose of the Act and establishes "an office of Inspector General" in each of a list of identified federal agencies, thereby consolidating audit and investigation responsibilities into one agency component. It provides:
"In order to create independent and objective units
"(1) to conduct and supervise audits and investigations relating to the programs and operations of the establishments listed in section 11(2);
"(2) to provide leadership and coordination and recommend policies for activities designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in, such programs and operations; and
"(3) to provide a means for keeping the head of the establishment and the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations and the necessity for and progress of corrective action; "there is hereby established in each of such establishments an office of Inspector General." 5 U. S. C. App. § 2, p. 1381.
NASA is one of more than 20 "establishment[s]" now listed in § 11(2).[3]
Section 3 of the IGA provides that each of the offices created by § 2 shall be headed by an Inspector General appointed by the President, and confirmed by the Senate, "without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, *239 or investigations." § 3(a). Each of these Inspectors General "shall report to and be under the general supervision of the head of the establishment involved or, to the extent such authority is delegated, the officer next in rank below such head," but shall not be subject to supervision by any lesser officer. Ibid. Moreover, an Inspector General's seniors within the agency may not "prevent or prohibit" the Inspector General from initiating or conducting any audit or investigation. Ibid.; see also § 6(a)(2). The President retains the power to remove an Inspector General from office. § 3(b).
Section 4 contains a detailed description of the duties of each Inspector General with respect to the agency "within which his Office is established." § 4(a). Those duties include conducting audits and investigations, recommending new policies, reviewing legislation, and keeping the head of the agency and the Congress "fully and currently informed" through such means as detailed, semiannual reports. §§ 4(a)(1)(5). Pursuant to § 5, those reports must be furnished to the head of the agency, who, in turn, must forward them to the appropriate committee or subcommittee of Congress with such comment as the agency head deems appropriate. § 5(b)(1); see also § 5(d). Section 6 grants the Inspectors General specific authority in a variety of areas to facilitate the mission of their offices. Accordingly, Inspectors General possess discretion to conduct investigations "relating to the administration of the programs and operations of the applicable" agency, § 6(a)(2); the ability to request information and assistance from Government agencies, § 6(a)(3); access to the head of the agency, § 6(a)(6); and the power to hire employees, enter into contracts, and spend congressionally appropriated funds, §§ 6(a)(7), (9); see also § 3(d). Finally, § 9(a)(1)(P) provides for the transfer of the functions previously performed by NASA's "`Management Audit Office' and the `Office of Inspections and Security' " to NASAOIG.
*240 The IGA created no central office or officer to supervise, direct, or coordinate the work of all OIG's and their respective staffs. Other than congressional committees (which are the recipients of the reports prepared by each Inspector General) and the President (who has the power to remove an Inspector General), each Inspector General has no supervising authorityexcept the head of the agency of which the OIG is a part. There is no "OIGOIG." Thus, for example, NASAOIG maintains an office at NASA's Huntsville facility, which reports to NASAOIG in Washington, and then to the NASA Administrator, who is the head of the agency. § 11(1); 50 F. L. R. A., at 602.[4] In conducting their work, Congress certainly intended that the various OIG's would enjoy a great deal of autonomy. But unlike the jurisdiction of many law enforcement agencies, an OIG's investigative office, as contemplated by the IGA, is performed with regard to, and on behalf of, the particular agency in which it is stationed. See 5 U. S. C. App. §§ 2, 4(a), 6(a)(2). In common parlance, the investigators employed in NASA's OIG are unquestionably "representatives" of NASA when acting within the scope of their employment.
Minimizing the significance of this statutory plan, NASA and NASAOIG emphasize the potentially divergent interests of the OIG's and their parent agencies. To be sure, OIG's maintain authority to initiate and conduct investigations and audits without interference from the head of the agency. § 3(a). And the ability to proceed without consent from agency higher-ups is vital to effectuating Congress' intent and maintaining an opportunity for objective inquiries into bureaucratic waste, fraud, abuse, and mismanagement.[5] *241 But those characteristics do not make NASAOIG any less a representative of NASA when it investigates a NASA employee. That certain officials within an agency, based on their views of the agency's best interests or their own, might oppose an OIG investigation does not tell us whether the investigators are "representatives" of the agency during the course of their duties. As far as the IGA is concerned, NASAOIG's investigators are employed by, act on behalf of, and operate for the benefit of NASA.
Furthermore, NASA and NASAOIG overstate the inherent conflict between an OIG and its agency. The investigation in this case was initiated by NASA's OIG on the basis of information provided by the FBI, but nothing in the IGA indicates that, if the information had been supplied by the Administrator of NASA rather than the FBI, NASAOIG would have had any lesser obligation to pursue an investigation. See §§ 4(a)(1), (d), 7; S. Rep. No. 95-1071, p. 26 (1978). The statute does not suggest that one can determine whether the OIG personnel engaged in such an investigation are "representatives" of NASA based on the source of the information prompting an investigation. Therefore, it must be NASA's and NASAOIG's position that even when an OIG conducts an investigation in response to a specific request from the head of an agency, an employee engaged in that assignment is not a "representative" of the agency within the meaning of § 7114(a)(2)(B) of the FSLMRS. Such management-prompted investigations are not rare.[6]
*242 Thus, not all OIG examinations subject to § 7114(a)(2)(B) will implicate an actual or apparent conflict of interest with the rest of the agency; and in many cases we can expect honest cooperation between an OIG and management-level agency personnel. That conclusion becomes more obvious when the practical operation of OIG interviews and § 7114(a)(2)(B) rights are considered. The IGA grants Inspectors General the authority to subpoena documents and information, but not witnesses. 5 U. S. C. App. § 6(a)(4). Nor does the IGA allow an OIG to discipline an agency employee, as all parties to this case agree. There may be other incentives for employee cooperation with OIG investigations, but formal sanctions for refusing to submit to an OIG interview cannot be pursued by the OIG alone. Such limitations on OIG authority enhance the likelihood and importance of cooperation between the agency and its OIG. See generally §§ 6(a)(3), (b)(1)(2) (addressing an Inspector General's authority to request assistance from others in the agency, and their duty to respond); §§ 4(a)(5), (d); 50 F. L. R. A., at 616; App. to Pet. for Cert. 65a (noting information sharing between NASAOIG and other agency officials). Thus, if the NASAOIG investigator in this case told the employee that he would face dismissal if he refused to answer questions, 120 F. 3d, at 1210, n. 2, the investigator invoked NASA's authority, not his own.[7]
*243 Considering NASAOIG's statutorily defined role within the agency, we cannot conclude that the proper operation of the IGA requires nullification of § 7114(a)(2)(B) in all OIG examinations.

IV
Although NASA's and NASAOIG's narrow reading of the phrase "representative of the agency" is supported by the text of neither the FSLMRS nor the IGA, they also present broaderbut ultimately unpersuasivearguments of policy to defeat the application of § 7114(a)(2)(B) to OIG investigations.
First, NASA and NASAOIG contend that enforcing § 7114(a)(2)(B) in situations similar to this case would undermine NASAOIG's ability to maintain the confidentiality of investigations, particularly those investigations conducted jointly with law enforcement agencies. Cf. 5 U. S. C. App. §§ 5(e)(1)(C), (e)(2) (restricting OIG disclosure of information that is part of an ongoing criminal investigation). NASA and its OIG are no doubt correct in suggesting that the presence of a union representative at an examination will increase the likelihood that its contents will be disclosed to third parties. That possibility is, however, always present: NASA and NASAOIG identify no legal authority restricting an employee's ability to discuss the matter with others. Furthermore, an employee cannot demand the attendance of a union representative when an OIG examination does not involve reasonably apparent potential discipline for that employee. Interviewing an employee who may have information relating to agency maladministration, but who is not himself under suspicion, ordinarily will not trigger the right to union representation. Thus, a variety of OIG investigations and interviewsand many in which confidentiality concerns are heightenedwill not implicate § 7114(a)(2)(B) at all. Though legitimate, NASA's and NASAOIG's confidentiality concerns are not weighty enough to justify a *244 nontextual construction of § 7114(a)(2)(B) rejected by the Authority.
Second, NASA and its OIG submit that, in other instances, the Authority has construed § 7114(a)(2)(B) so broadly that it will impair NASAOIG's ability to perform its investigatory responsibilities. The Authority responds that it has been sensitive to agencies' investigative needs in other cases, and that union representation is unrelated to OIG independence from agency interference. Whatever the propriety of the Authority's rulings in other cases, NASA and NASAOIG elected not to challenge the Authority's conclusion that the NASAOIG examiner's attempt to limit union representative participation constituted an unfair labor practice. To resolve the question presented in this case, we need not agree or disagree with the Authority's various rulings regarding the scope of § 7114(a)(2)(B), nor must we consider whether the outer limits of the Authority's interpretation so obstruct the performance of an OIG's statutory responsibilities that the right must be more confined in this context.[8]
In any event, the right Congress created in § 7114(a)(2)(B) vindicates obvious countervailing federal policies. It provides a procedural safeguard for employees who are under investigation by their agency, and the mere existence of the right can only strengthen the morale of the federal work force. The interest in fair treatment for employees under *245 investigation is equally strong whether they are being questioned by employees in NASA's OIG or by other representatives of the agency. And, as we indicated in Weingarten, representation is not the equivalent of obstruction. See 420 U. S., at 262-264. In many cases the participation of a union representative will facilitate the factfinding process and a fair resolution of an agency investigationor at least Congress must have thought so.
Whenever a procedural protection plays a meaningful role in an investigation, it may impose some burden on the investigators or agency managers in pursuing their mission. We must presume, however, that Congress took account of the policy concerns on both sides of the balance when it decided to enact the IGA and, on the heels of that statute, § 7114(a)(2)(B).[9]

*246 V
Finally, NASA argues that it was error for the Authority to make NASA itself, as well as NASA's OIG, a party to the enforcement order because NASA has no authority over the manner in which NASAOIG conducts its investigations. However, our conclusion that the investigator in this case was acting as a "representative" of NASA for purposes of § 7114(a)(2)(B) makes it appropriate to charge NASAOIG, as well as the parent agency to which it reports and for which it acts, with responsibility for ensuring that such investigations are conducted in compliance with the FSLMRS. NASA's Administrator retains general supervisory authority over NASA's OIG, 5 U. S. C. App. § 3(a), and the remedy imposed by the Authority does not require NASA to interfere unduly with OIG prerogatives. NASA and NASAOIG offer no convincing reason to believe that the Authority's remedy is inappropriate in view of the IGA, or that it will be ineffective in protecting the limited right of union representation secured by § 7114(a)(2)(B). See generally 5 U. S. C. §§ 706, 7123(c).
The judgment of the Court of Appeals is
Affirmed.
Justice Thomas, with whom The Chief Justice, Justice O'Connor, and Justice Scalia join, dissenting.
In light of the independence guaranteed Inspectors General by the Inspector General Act of 1978, 5 U. S. C. App. § 1 et seq., p. 1381, investigators employed in the Office of Inspector General (OIG) will not represent agency management in the typical case. There is no basis for concluding, as the Federal Labor Relations Authority (Authority) *247 did, that in this case the investigator from OIG for the National Aeronautics and Space Administration was a "representative of the agency" within the meaning of 5 U. S. C. § 7114(a)(2)(B). I respectfully dissent.

I
The National Aeronautics and Space Administration is headquartered in Washington, D. C. Among other agency subcomponents are the George C. Marshall Space Flight Center (Marshall Center), located in Huntsville, Alabama, and the Office of Inspector General, which is headquartered in Washington, D. C., but maintains offices in all of the agency's other subcomponents, including the Marshall Center. In January 1993, the Federal Bureau of Investigation received information that an employee of the Marshall Center, who is referred to in the record only as "P," was suspected of spying upon and threatening various co-workers. The FBI referred the matter directly to NASA's OIG, and an investigator for that Office who was stationed at the Marshall Center was assigned the case. He contacted P, who agreed to be interviewed so long as his attorney and a union representative were present; the investigator accepted P's conditions. App. to Pet. for Cert. 61a. At the interview, OIG's investigator read certain ground rules, which provided, inter alia, that the union representative was "`not to interrupt the question and answer process.' " Ibid.[1] The union filed an unfair labor practice charge, claiming that the interview was not conducted in accordance with the requirements of 5 U. S. C. § 7114(a)(2)(B), as the Authority has interpreted that provision. The Authority's General Counsel issued a complaint to that effect, and the Authority found that *248 NASA headquarters and NASA's OIG had committed unfair labor practices. On review, the Court of Appeals for the Eleventh Circuit granted the Authority's application for enforcement of its order. 120 F. 3d 1208 (1997).
As the Court correctly recognizes, ante, at 233, several points are not in dispute at this stage of the litigation. The fact that P requested union representation and reasonably believed that disciplinary action might be taken against him on the basis of information developed during the examination has never been in dispute in this case. See NASA, 50 F. L. R. A. 601, 606, n. 4 (1995). Although petitioners contested the matter before the Authority, on review in the Eleventh Circuit, they conceded that OIG's investigator conducted the interview of P in a way that did not comport with what § 7114(a)(2)(B) requires. See 120 F. 3d, at 1211. And all parties agree that the relevant "agency" for purposes of § 7114(a)(2)(B) is NASA. One other point is not disputed the "representative" to which § 7114(a)(2)(B) refers must represent agency management, not just the agency in some general sense as the Court suggests, ante, at 233-234, 240. See 50 F. L. R. A., at 614 ("`[R]epresentative of the agency' under section 7114(a)(2)(B) should not be so narrowly construed as to exclude management personnel employed in other subcomponents of the agency"); id., at 615 ("`We doubt that Congress intended that union representation be denied to the employee solely because the management representative is employed outside the bargaining unit' ") (quoting Defense Criminal Investigative Serv. v. FLRA, 855 F. 2d 93, 99 (CA3 1988)); Brief for Respondent FLRA 16 ("The Authority has determined that the phrase `representative of the agency' should not be so narrowly construed as to exclude management personnel, such as the OIG, who are located in other components of the agency"); id., at 21; Reply Brief for Petitioners 1 ("[A] `representative of the agency' in Section 7114(a)(2)(B) must be a representative of agency management ").
*249 Since an agency's stated reasons for decision are important in any case reviewing agency action, I summarize in some detail what the Authority actually said in this case. It began by stating its conclusion:
"We reach this conclusion based upon our determination that: (1) the term `representative of the agency' under section 7114(a)(2)(B) should not be so narrowly construed as to exclude management personnel employed in other subcomponents of the agency; (2) the statutory independence of agency OIGs is not determinative of whether the investigatory interviews implicate section 7114(a)(2)(B) rights; and (3) section 7114(a)(2)(B) and the IG Act are not irreconcilable." 50 F. L. R. A., at 614.
The Authority headed its discussion of its first determination "Section 7114(a)(2)(B) Covers the Actions of Management Personnel Employed in Other Subcomponents of the Agency." Id., at 615. This statement appears to suggest OIG itself is part of agency management. But the remainder of the Authority's discussion appears to advance a different theoryone that OIG serves as agency management's agent because OIG inspectors ultimately report to NASA's Administrator, see ibid. (OIG's investigator, "although employed in a separate component from the MSFC, is an employee of and ultimately reports to the head of NASA"), and because OIG provides information to management that sometimes results in discipline to union employees, ibid. ("OIG not only provides investigatory information to NASA [headquarters] but also to other NASA subcomponent offices"); see also id., at 616 (Congress would regard an OIG investigator as a representative of the agency because "[t]he information obtained during the course of an OIG investigatory examination may be released to, and used by, other subcomponents of NASA to support administrative or disciplinary *250 actions taken against unit employees").[2] The Authority recognized that the Inspector General Act grants an Inspector General, or IG, "a degree of freedom and independence from the parent agency." Id., at 615. It thought, however, that the Inspector General's autonomy "becomes nonexistent" when the IG's investigation concerns allegations of misconduct by agency employees in connection with their work and the information obtained during the investigation possibly would be shared with agency management. Ibid. As it further explained: "[I]n some circumstances, NASA, OIG performs an investigatory role for NASA [headquarters] and its subcomponents, specifically [the Marshall Center]." Id., at 616 (emphasis added). Moreover, the Authority reasoned, the Inspector General "plays an integral role in assisting the agency and its subcomponent offices in meeting the agency's objectives." Id., at 617. In light of all this, the Authority concluded:
"Plainly, the IG represents and safeguards the entire agency's interests when it investigates the actions of the agency's employees. Such activities support, rather than threaten, broader agency interests and make the IG a participant, with other agency components, in meeting various statutory obligations, including the agency's labor relations obligations under the Statute." Ibid. 

*251 II
The Authority's recognition that § 7114(a)(2)(B) protections are only triggered when an investigation is conducted by, or on behalf of, agency management, is important and hardly surprising. See, e. g., 50 F. L. R. A., at 614 ("section 7114(a)(2)(B) should not be so narrowly construed as to exclude management personnel employed in other subcomponents of the agency" (emphasis added)); Brief for Respondent FLRA 21 ("The Authority's conclusion that the word `representative,' or phrase `representative of the agency,' includes management personnel in other subcomponents of the `agency' is entirely consistent with the language of the [Federal Service Labor-Management Relations Statute]" (emphasis added)). It is important because the Court seems to think it enough that NASA's OIG represent NASA in some broad and general sense. But as the Authority's own opinion makes clear, that is not enoughNASA's OIG must represent NASA's management to qualify as a "representative of the agency" within the meaning of § 7114(a)(2)(B). The Authority's position is hardly surprising in that the Federal Service Labor-Management Relations Statute (FSLMRS) plainly means just that.[3] The FSLMRS governs labormanagement relations in the federal sector. Section 7114(a)(2)(B) is captioned "[r]epresentation rights and duties," and every employee right contained therein flows from the collective-bargaining relationship.[4] As petitioners note, *252 in each of the three instances where the FSLMRS refers to an agency representative, it does so in the context of the collective-bargaining relationship between management and labor. See §§ 7103(a)(12), 7114(a)(2)(A), 7114(a)(2)(B).[5]
Investigators within NASA's OIG might be "representatives of the agency" in two ways. First, if NASA's Inspector General and NASA's OIG itself were part of agency management, I suppose that employees of the Office necessarily would be representatives of agency management. But, to the extent that the Authority meant to hold that, there is no *253 basis for its conclusion. OIG has no authority over persons employed within the agency outside of its Office and similarly has no authority to direct agency personnel outside of the Office. Inspectors General, moreover, have no authority under the Inspector General Act to punish agency employees, to take corrective action with respect to agency programs, or to implement any reforms in agency programs that they might recommend on their own. See generally Inspector General Authority to Conduct Regulatory Investigations, 13 Op. Off. Legal Counsel 54, 55 (1989); Congressional Research Service, Report for Congress, Statutory Offices of Inspector General: A 20th Anniversary Review 7 (Nov. 1998). The Inspector General is charged with, inter alia, investigating suspected waste, fraud, and abuse, see 5 U. S. C. App. §§ 2, 4, 6, and making policy recommendations (which the agency head is not obliged to accept), see §§ 4(a)(3), (4), but the Inspector General Act bars the Inspector General from participating in the performance of agency management functions, see § 9(a). Moreover, OIG is not permitted to be party to a collective-bargaining relationship. See 5 U. S. C. § 7112(b)(7) (prohibiting "any employee primarily engaged in investigation or audit functions" from participating in a bargaining unit).
Investigators within NASA's OIG might "represent" the agency if they acted as agency management's representativeessentially, if OIG was agency management's agent or somehow derived its authority from agency management when investigating union employees. And something akin to an agency theory appears to be the primary basis for the Authority's decision. The agency theory does have a textual basis§ 7114(a)(2)(B)'s term "representative," as is relevant in this context, can mean "standing for or in the place of another: acting for another or others: constituting the agent for another esp[ecially] through delegated authority," or "one that represents another as agent, deputy, substitute, or delegate usu[ally] being invested with the authority of the principal." *254 Webster's Third New International Dictionary 1926 1927 (1976); see also Webster's New International Dictionary 2114 (2d ed. 1957) ("[b]eing, or acting as, the agent for another, esp. through delegated authority"). The agency notion, though, is counterintuitive, given that, as the majority acknowledges, ante, at 238, the stated purpose of the Inspector General Act was to establish "independent and objective units" within agencies to conduct audits and investigations, see 5 U. S. C. App. § 2 (emphasis added).
To be sure, NASA's OIG is a subcomponent of NASA and the Inspector General is subject to the "general supervision," § 3(a), of NASA's Administrator (or of the "officer next in rank below" the Administrator, ibid. ).[6] But, as the Fourth Circuit has observed, it is hard to see how this "general supervision" amounts to much more than "nominal" supervision. See NRC v. FLRA, 25 F. 3d 229, 235 (1994). NASA's Inspector General does not depend upon the Administrator's approval to obtain or to keep her job. NASA's Inspector General must be appointed by the President and confirmed by the Senate, "without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations." 5 U. S. C. App. § 3(a). Only the President, and not NASA's Administrator, may remove the Inspector General, and even then the President must provide Congress with his reasons for doing so. § 3(b).[7] In addition, the Administrator has no *255 control over who works for the Inspector General. Inspectors General have the authority to appoint an Assistant Inspector General for Auditing and another Assistant Inspector General for Investigations, §§ 3(d)(1), (2), may "select, appoint, and employ such officers and employees as may be necessary," § 6(a)(7), and also are authorized to employ experts and consultants and enter into contracts for audits, studies, and other necessary services, see §§ 6(a)(8), (9); see generally P. Light, Monitoring Government: Inspectors General and the Search for Accountability 175-185 (1993) (describing the "unprecedented freedom" that IG's have under the Inspector General Act in organizing their offices and how IG's have enhanced their independence by exercising their statutory authority in this regard to the fullest).
Inspectors General do not derive their authority to conduct audits and investigate agency affairs from agency management. They are authorized to do so directly under the Inspector General Act. 5 U. S. C. App. § 2(1). Neither NASA's Administrator, nor any other agency official, may "prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation." § 3(a). The Administrator also may not direct the Inspector General to undertake a particular investigation; the Inspector General Act commits to the IG's discretion the decision whether to investigate or report upon the agency's programs and operations. § 6(a)(2). The Authority's counsel argued to the contrary, but could not provide a single example of an instance where an agency head *256 has directed an Inspector General to conduct an investigation in a particular manner. Tr. of Oral Arg. 40, see also id., at 46-48 (counsel for respondent American Federation of Government Employees (AFGE) also unable to provide an example of agency head direction of OIG investigation). The Authority's counsel also could not support his assertion that agency heads have the power to direct the Inspector General to comply with laws such as the FSLMRS. Id., at 41-43.
Inspectors General, furthermore, are provided a broad range of investigatory powers under the Act. They are given access to "all records, reports, audits, reviews, documents, papers, recommendations, or other material" of the agency. 5 U. S. C. App. § 6(a)(1). They may issue subpoenas to obtain such information if necessary, and any such subpoena is enforceable by an appropriate United States district court. § 6(a)(4).[8] The Inspector General also may "administer to or take from any person an oath, affirmation, or affidavit, whenever necessary." § 6(a)(5). Inspectors General do not have the statutory authority to compel an employee's attendance at an interview. But if an employee refuses to attend an interview voluntarily, the Inspector General may request assistance, § 6(a)(3), and the agency head "shall . . . furnish . . . information or assistance" to OIG, § 6(b)(1).
NASA's Inspector General does, as the Authority claimed, provide information developed in the course of her audits and investigations to the Administrator. §§ 2(3), 4(a)(5). But she has outside reporting obligations as well. Inspectors General must prepare semiannual reports to Congress "summarizing the activities of the Office." § 5. Those reports first are delivered to the agency head, § 5(b), and the Administrator may add comments to the report, § 5(b)(1), but *257 the Administrator may not prevent the report from going to Congress and may not change or order the Inspector General to change his report. Moreover, the Inspector General must notify the Attorney General directly, without notice to other agency officials, upon discovery of "reasonable grounds to believe there has been a violation of Federal criminal law." § 4(d).
As a practical matter, the Inspector General's independence from agency management is understood by Members of Congress and Executive Branch officials alike. This understanding was on display at the recent congressional hearing on the occasion of the Inspector General Act's 20th anniversary. For example, Senator Thompson, Chairman of the Senate Government Affairs Committee, stated that "[t]he overarching question we need to explore is whether the Executive Branch is providing IGs with support and attention adequate to ensure their independence and effectiveness." Hearings on "The Inspector General Act: 20 Years Later" before the Senate Committee on Governmental Affairs, 105th Cong., 2d Sess., 2 (1998). He further explained that "[t]he IGs . . . are paid to give [Congress] an independent and objective version [of] events." Ibid. Senator Glenn, then the ranking minority member, opined that "the IG's first responsibility continues to be program and fiscal integrity; they are not `tools' of management." Id., at 7.
At those hearings, testimony was received from several Inspectors General. June Gibbs Brown, the Inspector General for the United States Department of Health and Human Services, praised Secretary Shalala for "never, not even once, [seeking] to encroach on [her] independence." Id., at 4. In her written testimony, she offered: "A key component of OIG independence is our direct communication with the Members and staff of the Congress. Frankly, I suspect that no agency head relishes the fact that IGs have, by law, an independent relationship with oversight Committees. Information can and must go directly from the Inspectors General *258 to the Hill, without prior agency and administration clearance." Id., at 45. The testimony of Susan Gaffney, the Inspector General for the United States Department of Housing and Urban Development, revealed that agency managers know all too well that the Inspector General is independent of agency management:
"[I]t is to me somewhat jolting, maybe shocking, that the current Secretary of HUD has exhibited an extremely hostile attitude toward the independence of the HUD OIG, and, as I have detailed in my written testimony, he has, in fact, let this hostility lead to a series of attacks and dirty tricks against the HUD OIG." Id., at 6.
In her written testimony, Ms. Gaffney further explained that, while, "[i]deally, the relationship between an IG and the agency head is characterized by mutual respect, a common commitment to the agency mission, and a thorough understanding and acceptance of the vastly different roles of the IG and the agency head," the current Secretary, in her view, was "uncomfortable with the concept of an independent Inspector General who is not subject to his control and who has a dual reporting responsibility." Id., at 48-49.
The Authority essentially provided four reasons why OIG represented agency management in this case: because OIG is a subcomponent of NASA and subject to the "general supervision" of its Administrator; because it provides information obtained during the course of its investigations to NASA headquarters and its subcomponents; because that information is sometimes used for administrative and disciplinary purposes; and because OIG's functions support broader agency objectives. In my view, the fact that OIG is housed in the agency and subject to supervision (an example of which neither the Authority nor the Court can provide) is an insufficient basis upon which to rest the conclusion that OIG's employees are "representatives" of agency management. It is hard to see how OIG serves as agency management's agent *259 or representative when the Inspector General is given the discretion to decide whether, when, and how to conduct investigations. See 5 U. S. C. App. §§ 3(a), 6(a).[9]
The fact that information obtained in the course of OIG interviews is shared with agency management and sometimes forms the basis for employee discipline is similarly unimpressive. The Court suggests that when this happens, OIG and agency management act in "concert." Ante, at 242, n. 7. The truth of the matter is that upon receipt of information from OIG, agency management has the discretion to impose discipline but it need not do so. And OIG has no determinative role in agency management's decision. See 5 U. S. C. App. § 9(a) (Inspector General may not participate in the performance of agency management functions). Although OIG may provide information developed in the course of an investigation to agency management, so, apparently, does the FBI, the DEA, and local police departments. See, e. g., 63 Fed. Reg. 8682 (1998) (FBI's disclosure policy); 62 Fed. Reg. 36572 (1997) (Immigration and Naturalization Service (INS) Alien File and Central Index System); 62 Fed. Reg. 26555 (1997) (INS Law Enforcement Support Center *260 Database); 61 Fed. Reg. 54219 (1996) (DEA); 60 Fed. Reg. 56648 (1995) (Secret Service, Bureau of Alcohol, Tobacco, and Firearms, and other Treasury components); 60 Fed. Reg. 18853 (1995) (United States Marshals Service (USMS)); 54 Fed. Reg. 42060 (1989) (FBI, USMS, and various Department of Justice record systems); see also 31 CFR § 1.36 (1998) (listing routine uses and other exemptions in disclosure of Treasury agencies' records). Surely it would not be reasonable to consider an FBI agent to be a "representative" of agency management just because information developed in the course of his investigation of a union employee may be provided to agency management. Merely providing information does not establish an agency relationship between management and the provider.
Similarly, the fact that OIG may promote broader agency objectives does not mean that it acts as management's agent. To be sure, as the Court points out, ante, at 240, OIG's mission is to conduct audits and investigations of the agency's programs and operations. See 5 U. S. C. App. §§ 2, 4(a). But just because two arms of the same agency work to promote overall agency concerns does not make one the other's representative. In any event, OIG serves more than just agency concerns. It also provides the separate function of keeping Congress aware of agency developments, a function that is of substantial assistance to the congressional oversight function.
The Court mentions, ante, at 242, that the Inspector General lacks the authority to compel witnesses to appear at an interview as if that provided support for the Authority's decision. Perhaps it is of the view that because the Inspector General must rely upon the agency head to compel an employee's attendance at an interview, management's authority is somehow imputed to OIG, or OIG somehow derives its authority from the agency. This proposition seems dubious at best. The Inspector General is provided the authority to investigate under the Inspector General Act, and is *261 given power to effectuate her responsibilities through, inter alia, requesting assistance as may be necessary in carrying out her duties. 5 U. S. C. App. § 6(a)(3). The head of the agency must furnish information and assistance to the IG, "insofar as is practicable and not in contravention" of law. § 6(b)(1). Perhaps, then, when agency management directs an employee to appear at an OIG interview, management acts as OIG's agent.
The proposition seems especially dubious in this case, as P agreed to be interviewed. The record does not reveal that NASA's management compelled him to attend the interview nor does it reveal that P was threatened with discipline if he did not attend the interview. The Eleventh Circuit, to be sure, indicated that OIG's investigator threatened P with discipline if he did not answer the questions put to him. But that threat, assuming it indeed was made, had little to do with attendance and more to do with the conduct of the interview. As the Authority has interpreted § 7114(a)(2)(B), as the Court notes, ante, at 242, n. 7, no unfair labor practice is committed if an employee who requests representation is given the choice of proceeding without representation and discontinuing the interview altogether. Perhaps it could be argued that by threatening P with discipline ifhe did not answer the questions put to him, rather than giving P the choice of proceeding without representation, that OIG's investigator invoked agency management's authority to compel (continued) attendance. Along those lines, respondent AFGE contends that OIG's representative must have been acting for agency management by threatening P with discipline because only NASA's Administrator and his delegates, 5 U. S. C. § 302(b)(1); 42 U. S. C. § 2472(a), have the authority to discipline agency employees. Brief for Respondent AFGE 15-16. If OIG's investigator did mention that P could face discipline, he was either simply stating a fact or clearly acting ultra vires. OIG has no authority to discipline or otherwise control agency employees. Since the mere invocation *262 of agency management's authority is not enough to vest that authority with OIG's investigator, the argument, then, must be that it was reasonable for P to believe that OIG's investigator might have the ability to exercise agency management's authority. That is a question we simply cannot answer on this record. And more important, I do not think that § 7114(a)(2)(B) can be read to have its applicability turn on an after-the-fact assessment of interviewees' subjective perceptions, or even an assessment of their reasonable beliefs.

* * *
In light of the Inspector General's independenceguaranteed by statute and commonly understood as a practical realityan investigator employed within NASA's OIG will not, in the usual course, represent NASA's management within the meaning of § 7114(a)(2)(B). Perhaps there are exceptional cases where, under some unusual combination of facts, investigators of the OIG might be said to represent agency management, as the statute requires. Cf. FLRA v. United States Dept. of Justice, 137 F. 3d 683, 690-691 (CA2 1997) ("So long as the OIG agent is questioning an employee for bona fide purposes within the authority of the [Inspector General Act] and not merely accommodating the agency by conducting interrogation of the sort traditionally performed by agency supervisory staff in the course of carrying out their personnel responsibilities, the OIG agent is not a `representative' of the employee's agency for purposes of section 7114(a)(2)(B)"), cert. pending, No. 98-667. This case, however, certainly does not present such facts. For the foregoing reasons, I respectfully dissent.
NOTES
[*] Gregory O'Duden and Barbara A. Atkin filed a brief for the National Treasury Employees Union as amicus curiae urging affirmance.
[1] Congressman Udall, whose substitute contained the section at issue, explained that the "provisions concerning investigatory interviews reflect the . . . holding in" Weingarten. 124 Cong. Rec. 29184 (1978); Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978 (Committee Print compiled for the House Subcommittee on Postal Personnel and Modernization of the Committee on Post Office and Civil Service), Ser. No. 96-7, p. 926 (1979) (hereinafter FSLMRS Leg. Hist.); see NASA, 50 F. L. R. A. 601, 606 (1995).
[2] See id., at 608, n. 5 (Congress recognized that the right to union representation might evolve differently in the federal and private sectors); H. R. Conf. Rep. No. 95-1717, p. 156 (1978), FSLMRS Leg. Hist. 824; cf. Karahalios v. Federal Employees, 489 U. S. 527, 534 (1989) (the FSLMRS "is not a carbon copy of the NLRA").
[3] Such establishments are described as "agencies" in other federal legislation, such as the FSLMRS. See 5 U. S. C. §§ 101-105, 7103(a)(3). Note also that other OIG's were created by subsequent amendments to the IGA and may be structured differently than those OIGs, such as NASA's, discussed in the text. See, e. g., 5 U. S. C. App. §§ 8, 8E, 8G.
[4] At oral argument, NASA and NASAOIG indicated that the Administrator's general supervision authority includes the ability to require its Inspector General to comply with, inter alia, equal employment opportunity regulations. Tr. of Oral Arg. 5.
[5] See § 2; S. Rep. No. 95-1071, pp. 1, 5-7, 9 (1978); H. R. Rep. No. 95-584, pp. 2, 5-6 (1977).
[6] See, e. g., United States INS, 46 F. L. R. A. 1210, 1226-1231 (1993), review den. sub nom. American Federation of Govt. Employees, AFL CIO, Local 1917 v. FLRA, 22 F. 3d 1184 (CADC 1994); United States Dept. of Justice, INS, 46 F. L. R. A. 1526, 1549 (1993), review granted sub nom. United States Dept. of Justice v. FLRA, 39 F. 3d 361 (CADC 1994); Department of Defense, Defense Criminal Investigative Serv., 28 F. L. R. A. 1145, 1157-1159 (1987), enf'd sub nom. Defense Criminal Investigative Serv. v. FLRA, 855 F. 2d 93 (CA3 1988); see also Martin v. United States, 20 Cl. Ct. 738, 740-741 (1990).
[7] In fact, a violation of § 7114(a)(2)(B) seems less likely to occur when the agency and its OIG are not acting in concert. Under the Authority's construction of the FSLMRS, when an employee within the unit makes a valid request for union representation, an OIG investigator does not commit an unfair labor practice by (1) halting the examination, or (2) offering the employee a choice between proceeding without representation and discontinuing the examination altogether. United States Dept. of Justice, Bureau of Prisons, 27 F. L. R. A. 874, 879-880 (1987); see also NLRB v. J. Weingarten, Inc., 420 U. S. 251, 258-260 (1975). Disciplining an employee for his or her choice to demand union participation or to discontinue an examination would presumably violate the statute, but such responses require more authority than Congress granted the OIG's in the IGA.
[8] The same can be said of NASA's and NASAOIG's concerns that the reach of § 7114(a)(2)(B) will become the subject of collective bargaining between agencies and unions, or hinder joint or independent FBI investigations of federal employees. See United States Nuclear Regulatory Comm'n v. FLRA, 25 F. 3d 229 (CA4 1994) (adopting the agency's position that it could not bargain over certain procedures by which its OIG conducts investigatory interviews); 50 F. L. R. A., at 616, n. 13 (distinguishing FBI investigations). The process by which the scope of § 7114(a)(2)(B) may properly be determined, and the application of that section to law enforcement officials with a broader charge, present distinct questions not now before us.
[9] The dissent does not dispute much of our analysis; it indicates that NASAOIG is an "ar[m]" of NASA "work[ing] to promote overall agency concerns." Post, at 260. The dissent's premise is that the Authority determined that the phrase "representative of the agency" means "representative of . . . agency [management]," and that this issue is now uncontested. See post, at 246-247, 248-259, 262. But see post, at 251, n. 3. Putting aside the fact that NASA's and NASAOIG's construction of the statutehowever one interprets their argumentis very much in dispute, see Brief for Respondent American Federation of Government Employees, AFLCIO 26-32; Brief for Respondent FLRA 23-25, 31, and the rule that litigants cannot bind us to an erroneous interpretation of federal legislation, see Roberts v. Galen of Va., Inc., 525 U. S. 249, 253 (1999), we have ignored neither the actual rationale of the Authority's decision in this case nor NASA's and NASAOIG's arguments before this Court. Focusing on its plain reasoning, we cannot fairly read the Authority's decision as turning on whether NASA "management" was involved. The Authority emphasized that FSLMRS rights do not depend on "the organizational entity within the agency to whom the person conducting the examination reports"; and in discussing NASAOIG's role within the agency, the Authority's decision repeatedly refers to NASA headquarters together with its componentsthat is, to the agency as a whole. 50 F. L. R. A., at 615-616; id., at 621 (noting "the investigative role that OIG's perform for the agency" and concluding that NASAOIG "represents" not only its own interests, "but ultimately NASA [headquarters] and its subcomponent offices"). Nowhere did the Authority rely on the assertion that OIG's act as "agency management's agent," a term coined by the dissent. Post, at 253.
[1] It appears that OIG's inspector informed P that he would face dismissal if he did not answer the questions put to him. See 120 F. 3d 1208, 1210, n. 2 (CA11 1997).
[2] The Authority also relied on a policy ground here. It asserted that there was "no basis in the Statute or itslegislative history to make the existence of [the representational rights provided by § 7114] dependent upon the organizational entity within the agency to whom the person conducting the examination reports." 50 F. L. R. A., at 615. It elaborated, in a footnote, that "[i]f such were the case, agencies could abridge bargaining unit rights and evade statutory responsibilities under section 7114(a)(2)(B), and thus thwart the intent of Congress, by utilizing personnel from other subcomponents (such as the OIG) to conduct investigative interviews of bargaining unit employees." Id., at 615, n. 12.
[3] Although it is significant that the Authority recognized below and recognizes here that the statutory phrase "representative of the agency" refers to a representative of agency management, I do not, as the Court asserts, ante, at 245-246, n. 9, rest the argument on the premise that the point is conceded. Rather, in light of the context in which the phrase appears, and in light of the very subject matter of the statute, the phrase plainly has that meaning.
[4] Section 7114(a)(1) details what "[a] labor organization which has been accorded exclusive recognition" is entitled to and must do; § 7114(a)(2) indicates when an exclusive representative may be present at discussions or examinations conducted by agency management; § 7114(a)(3) requires agency management annually to inform its employees of their rights under § 7114(a)(2)(B); § 7114(a)(4) obligates management and the exclusive representative to bargain in good faith for purposes of arriving at a collectivebargaining agreement; § 7114(a)(5) provides that the rights of an exclusive representative do not limit an employee's right to seek other representation, for example, legal counsel; § 7114(b) speaks to the duty of good faith imposed on management and the exclusive representative under § 7114(a)(4); and § 7114(c) requires the head of the agency to approve all collective-bargaining agreements.
[5] I disagree with the Court as to the proper reading of petitioners' argument that the phrase "representative of the agency" refers only to the entity that has a collective-bargaining relationship with a union. I do not take petitioners to mean that OIG's representative did not represent the "agency," NASA, for the simple reason that only Space Center management had a collective-bargaining relationship with P's union. If that were truly petitioners' view, its later argument that OIG cannot represent NASA because the IG is substantially independent from the agency head would not make senseit would be enough for petitioners to argue that OIG is not under the control of the Marshall Center's management. Rather, as petitioners make clear in their reply brief, they are simply arguing that "a `representative of the agency' must be a representative of agency management, as opposed to just another employee." Reply Brief for Petitioners 2, and n. 4. It appears that they would agree, in accordance with the Authority's precedent, see, e. g., Air Force Logistics Command, 46 F. L. R. A. 1184, 1186 (1993); Department of Health and Human Services, 39 F. L. R. A. 298, 311-312 (1991), that NASA headquarters also qualifies as agency management under the FSLMRS, even though it lacks a direct collective-bargaining relationship with a union, because it directs its subordinate managers who have such a collective-bargaining relationship.
[6] The Act provides that the Inspector General "shall not report to, or be subject to supervision by," any other agency officer. 5 U. S. C. App. § 3(a).
[7] The Court, ante, at 240, does not report the full story with respect to Inspector General supervision. We were told at oral argument that Executive Order 12993, 3 CFR 171 (1996), governs the procedures to be followed in those instances where the Inspector General and NASA's Administrator are in conflict. Tr. of Oral Arg. 51-52. Complaints against an Inspector General are referred to a body known as the "Integrity Committee," which is composed "of at least the following members": an official of the FBI, who serves as Chair of the Integrity Committee; the Special Counsel of the Office of Special Counsel; the Director of the Office of Government Ethics; and three or more Inspectors General, representing both the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency. The Chief of the Public Integrity Section of the Criminal Division of the Department of Justice, or his designee, serves as an advisor to the Integrity Committee with respect to its responsibilities and functions under the Executive Order.
[8] The Inspector General, however, does not have the authority to subpoena documents and information from other federal agencies. See 5 U. S. C. App. §§ 6(a)(4), 6(b)(1).
[9] The Court posits, ante, at 241, that "nothing in the [Inspector General Act] indicates that, if the information had been supplied by the Administrator of NASA rather than the FBI, NASAOIG would have had any lesser obligation to pursue an investigation." It appears shocked at the proposition that petitioners might think that "even when an OIG conducts an investigation in response to a specific request from the head of an agency, an employee engaged in that assignment is not a `representative' of the agency within the meaning of [5 U. S. C.] § 7114(a)(2)(B)." Ibid. The answer to the Court is quite simple. So far as the Inspector General Act reveals, OIG has no obligation to pursue any particular investigation. And presumably the Court would agree that if NASA's Administrator referred a matter to the FBI or the Drug Enforcement Administration (DEA) (who also, we are told, rely on agency management to compel an employee's appearance at an interview, Reply Brief for Petitioners 5-6), those independent agencies would not "represent" the agency. I fail to see how it is different when the investigatory unit, although independent from agency management, is housed within the agency.