**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, LOCAL
1592,

     Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY,

     Respondent.

----------------------------

NATIONAL TREASURY EMPLOYEES
UNION,

     Amicus Curiae.

No. 15-9542

_____

**Appeal from the Federal Labor Relations Authority**
**(FLRA No. DE-CA-08-0046)**
_____

Judith Galat, Assistant General Counsel (David A. Borer, General Counsel, with him on
the briefs), American Federation of Government Employees, AFL-CIO, Washington,
D.C., for Petitioner.

Zachary R. Henige, Deputy Solicitor (Fred B. Jacob, Solicitor, and Stephanie J. Fouse,
Attorney, with him on the brief), Federal Labor Relations Authority, Washington, D.C.,
for Respondent.

Gregory O'Duden, General Counsel, Julie M. Wilson, Associate General Counsel,
Matthew D. Ross, Assistant Counsel, filed an Amicus Curiae brief for the National
Treasury Employees Union, Washington, D.C., in support of Petitioner.

_____

Before **HARTZ**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Petitioner American Federation of Government Employees Local 1592 (the Union) seeks review of a decision of the Federal Labor Relations Authority (FLRA) in favor of the Department of the Air Force, Ogden Air Logistics Center, Hill Air Force Base, Utah (Hill Air Force Base or Hill). The FLRA rejected the Union's claim that Hill committed an unfair labor practice when it denied the request of its then-employee Joseph Ptacek Jr. to have a union representative present during questioning by the Air Force Office of Special Investigations (AFOSI) about his misuse of a work computer. The claim rested on a provision of the Federal Service Labor-Management Relations Statute (the Labor-Management Statute), 5 U.S.C. § 7101 *et seq.*, that provides federal employees who belong to a union with the right to the presence of a union representative when questioned about matters that could lead to discipline. *See id.* § 7114(a)(2)(B). The FLRA relied on President Carter's Executive Order 12,171, which exempts AFOSI from coverage under the Labor-Management Statute. *See* 5 U.S.C. § 7103(b)(1) (granting President power to exclude certain kinds of agencies from coverage under the Labor-Management Statute). We have jurisdiction under 5 U.S.C. § 7123(a). Because § 7103(b)(1) and Executive Order 12,171 extinguished any right to have a union representative present during a proper AFOSI interrogation, we deny the Union's petition.

2

## I.   BACKGROUND

### A.  The Investigation

The present dispute began in August 2007 when Ptacek, an employee of Hill Air Force Base and a member of the Union, was accused of viewing pornography on his work computer. One of his supervisors placed him on administrative leave while Hill's information-technology department investigated the accusation. When that investigation indicated that Ptacek may have accessed child pornography, AFOSI, which investigates felony-level crimes for the Air Force, took over the investigation.

An analysis of Ptacek's computer failed to find any stored child pornography, but it did reveal explicit search terms that may have referenced child pornography. At the request of AFOSI, one of Ptacek's supervisors, Kenneth Williams, directed him to come to Hill Air Force Base for an interview with AFOSI. Ptacek agreed and arrived at the base accompanied by his union representative, Richard Thomas. Williams then drove Ptacek to the AFOSI building, with Thomas following in his own vehicle.

Ptacek asked the AFOSI special agent in charge of the investigation if Thomas could attend the interview as his union representative. The agent denied the request and interviewed him outside the presence of both Williams and Thomas. After the investigation concluded in January 2008, Hill proposed terminating Ptacek's employment. But further discussion persuaded it to allow him to keep his job, with the understanding that he would be terminated if he continued inappropriate use of the computer. About a month later, Ptacek again misused his computer. He resigned to avoid termination.

### B. The Statutory Framework

The Labor-Management Statute provides a comprehensive framework for labor relations between the federal government and its employees. *See* 5 U.S.C. § 7101 *et seq.* (1978). It regulates employees' rights to join a public-sector union, *see id.* § 7102; the formation and recognition of unions, *see id.* § 7111; collective bargaining, *see, e.g.*, *id.* §§ 7117, 7119; and the rights and duties of management and unions, *see, e.g.*, *id.* §§ 7106, 7113, 7114. It also identifies actions by either an agency or a union that constitute unfair labor practices, such as interfering with the rights granted by the statute, *see id.* § 7116(a)(1), encouraging or discouraging union membership by discrimination in conditions of employment, *see id.* § 7116(a)(2), or otherwise violating the statute, *see id.* § 7116(a)(8). The FLRA has authority to determine whether an unfair labor practice occurred, *see id.* § 7118, subject to judicial review by a federal court of appeals, *see id.* § 7123(a). The Labor-Management Statute provides a variety of remedies for unfair labor practices, including orders to cease and desist, orders to renegotiate a collective-bargaining agreement, orders to reinstate an aggrieved employee with backpay, or "such other action as will carry out the purpose of [the Labor-Management Statute]." *Id.* § 7118(a)(7).

Not all federal employees are covered by the Labor-Management Statute. The statute explicitly excludes certain agencies, such as the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, and the Secret Service. *See id.* § 7103(a)(3). And "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national

4

security" is barred from belonging to a union. *Id.* § 7112(b)(6). In addition, Congress provided the President with authority to exclude other agencies from coverage under all or some of the provisions of the statute. The President may suspend *portions* of the Labor-Management Statute for agencies and activities outside the United States if the President deems it necessary for national security. *See id.* § 7103(b)(2). Or, relevant here, the President may exclude an agency from the *entire* statute if the agency "has as a primary function intelligence, counterintelligence, investigative, or national security work," and the statute "cannot be applied to that agency . . . in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1). President Carter exercised this latter authority in Executive Order No. 12,171, 44 Fed. Reg. 66565 (Nov. 19, 1979), which stated that certain agencies satisfied the requirements of § 7103(b)(1). *Id.* ¶ 1-101. The Order listed AFOSI as an excluded agency. *See id.* ¶ 1-206(k).

This appeal concerns whether as a result of this exclusion Ptacek had no right to a union representative when being interviewed by AFOSI despite § 7114(a)(2), which states:

> [The union representing employees in a unit] shall be given the opportunity to be represented at—
>
> . . .
>
> (B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if—
> (i) the employee reasonably believes that the examination may result in disciplinary action against the employee; and
> (ii) the employee requests representation.

5 U.S.C. § 7114(a)(2).

### C. Administrative Proceedings

5

The Union filed an unfair-labor-practice charge against Hill Air Force Base, asserting that Hill violated § 7114(a)(2)(B) by denying Ptacek's request for union representation during the interview by AFOSI, which allegedly was acting as "a representative of [Hill]," 5 U.S.C. § 7114(a)(2)(B). An administrative law judge (ALJ) concluded that because Executive Order 12,171 excluded AFOSI from coverage under the statute, AFOSI could not be a "representative" of Hill under § 7114(a)(2)(B). He found no violation of the statute and recommended that the FLRA dismiss the complaint. The FLRA agreed. *See U.S. Dep't of the Air Force, Ogden Air Logistics Ctr., Hill Air Force Base, Utah*, 68 FLRA 460 (Apr. 16, 2015). The majority of the three-member panel ruled that the plain meaning of § 7103(b)(1) authorized the President to exclude AFOSI from the entirety of the statute. *See id.* at 462–63. They contrasted § 7103(b)(1)'s text with that of § 7103(b)(2), which authorizes the President to suspend individual provisions of the Labor-Management Statute, *see id.* at 462–63, and held that AFOSI was precluded from being a representative of Hill for purposes of § 7114(a)(2)(B), *see id.* at 464–65. We affirm, though we express the point somewhat differently. Rather than saying that AFOSI was not a "representative" of Hill, we simply hold that there was no violation of the statute because it does not apply to proper investigations by AFOSI.

## II.    DISCUSSION

### A.    Standards of Review

We review FLRA decisions to determine "if they are arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law." *Am. Fed'n of Gov't Emps.,*

6

*AFL CIO Local 1592 v. FLRA.*, 288 F.3d 1238, 1240 (10th Cir. 2002) (internal quotation marks omitted). In assessing whether it properly interpreted the Labor-Management Statute, we proceed under the *Chevron* framework, which governs our review of "an agency's construction of the statute which it administers." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). We ask first whether Congress has spoken to "the precise question at issue." *Id.* at 843 n.9. If so, we must apply the unambiguous meaning of the statute. *See id.* If, however, the statute is ambiguous on the issue, we will defer to an agency's reasonable interpretation. *See id.* at 843–44; *Nat'l Fed'n of Fed. Emps., Local 1309 v. Dep't of Interior*, 526 U.S. 86, 92 (1999) (When "the [s]tatute's language [is] sufficiently ambiguous or open on the point," courts must defer "to reasonable interpretation or elaboration by the agency charged with its execution."); *Am. Fed'n of Gov't Emps.,* 288 F.3d at 1240 ("FLRA is entitled to considerable deference when interpreting and applying the provisions of its enabling statute." (internal quotation marks omitted)).

This deference is justified on two grounds. First, "[u]nder *Chevron*, we read Congress' silence as a delegation of authority to [the agency] to select from among reasonable options." *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1604 (2014); *see Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 381–82 (1988) (Scalia, J., concurring) ("[T]he general rationale for deference [is that] Congress would naturally expect that the agency would be responsible, within broad limits, for resolving ambiguities in its statutory authority or jurisdiction."). Second, the agency has expertise on the subject. *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496

7

U.S. 633, 651–52 (1990) ("[T]he judgments about the way the real world works that have gone into the [agency's] policy are precisely the kind that agencies are better equipped to make than are courts. This practical agency expertise is one of the principal justifications behind *Chevron* deference.").

In determining whether a statute is unambiguous, courts are to "employ[] traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9. "These tools include examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004); *see Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004). Even a statutory provision whose words might have multiple meanings is not necessarily ambiguous. "Ambiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

Our deference to the agency's interpretation of an ambiguous statute comes with a caveat: when an agency rests its interpretation on the erroneous view that the statute is unambiguous, we will not defer to the agency. *See PDK Labs., Inc. v. DEA,* 362 F.3d 786, 798 (D.C. Cir. 2004) ("[D]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled by Congress." (internal quotation marks omitted)); *cf. Negusie v. Holder*, 555 U.S. 511, 516, 521–24 (2009) (declining to defer to agency interpretation and remanding for reconsideration because agency erroneously believed its interpretation was compelled by a previous Supreme Court decision). This rule follows from *Chevron*'s underlying rationale. When an agency believes the statutory language leaves it no choice, it is not

8

bringing its policy preferences or expertise to bear on the question, so the reasons for *Chevron* deference are not present. *See Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) ("*Chevron* step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face. In precisely those kinds of cases, it is incumbent upon the agency not to rest simply on its parsing of the statutory language—it must bring its experience and expertise to bear in light of competing interests at stake." (brackets and internal quotation marks omitted)).

In this case the FLRA found the statute unambiguous. It wrote, "Because the plain wording of § 7103(b)(1) excludes AFOSI from all of the Statute's provisions, including § 7114(a)(2), we find that AFOSI's investigator did not act as a representative of [Hill] and, consequently, that [Hill] may not be held responsible under the Statute for the investigator's conduct in this case." 68 FLRA at 460. It rejected the policy concerns offered by the Union and the dissent because these concerns "must give way to the plain wording of the Statute" when, as here, AFOSI is acting within the scope of its authority. *Id.* at 464. In essence, it decided that its decision was compelled by Congress. *See id.* ("[E]ven when it seems incongruous for Congress to provide rights, but deny enforcement of those rights in particular circumstances, it is for Congress, not the [FLRA], to correct any problems arising from plain statutory wording." (alterations and internal quotation marks omitted)).

As a result, there is no room for deference to the FLRA on this appeal. If we agree that the Labor-Management Statute is unambiguous, we will either reverse in favor of the

9

Union or dismiss the petition, depending on our view of what the plain meaning requires. If, however, we find the statute ambiguous, we must remand to the agency to interpret the statute anew, free from its view that Congress has compelled its decision.

We now turn to interpreting the statute. After employing traditional tools of statutory interpretation, we hold that the statute clearly does not apply to AFOSI's investigation of Ptacek.

### B.     The Right to a Representative—§ 7114(a)(2)(B)

The right to have a union representative present during employee disciplinary investigations has been recognized as a central component of labor law for decades. In *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), the Supreme Court upheld the National Labor Relations Board's decision that it was an unfair labor practice to deny an employee's request for union representation at an investigatory interview that the employee reasonably believed might result in disciplinary action. *Id.* at 252–53, 260. The Court described the importance of such a right:

> Requiring a lone employee to attend an investigatory interview which he reasonably believes may result in the imposition of discipline perpetuates the inequality the [National Labor Relations] Act was designed to eliminate, and bars recourse to the safeguards the Act provided to redress the perceived imbalance of economic power between labor and management. . . . The Board's construction also gives recognition to the right when it is most useful to both employee and employer. A single employee confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors. A knowledgeable union representative could assist the employer by eliciting favorable facts, and save the employer production time by getting to the bottom of the incident occasioning the interview. Certainly his presence need not transform the interview into an adversary contest.

10

*Id.* at 262–63 (internal quotation marks omitted).  Section 7114(a)(2)(B) codifies the

*Weingarten* right for federal employees, providing the right to union representation when

requested at any examination by an employer representative that the "employee

reasonably believes . . . may result in disciplinary action against the employee."  5 U.S.C.

§ 7114(a)(2)(B).

The Supreme Court addressed the scope of § 7114(a)(2)(B) in *NASA v. FLRA*, 527

U.S. 229 (1999).  It held that "an investigator employed in NASA's Office of Inspector

General (NASA-OIG) can be considered a 'representative' of NASA when examining a

NASA employee, such that the right to union representation in the [Labor-Management

Statute] may be invoked."  *Id.* at 231.  The employee, who worked at the NASA facility

in Huntsville, Alabama, was suspected of threatening activities and was investigated by

NASA-OIG.  *See id.* at 231–32. Because the employee reasonably believed that the

investigation could result in his being disciplined, he requested representation by the

union at the Huntsville facility.  *See id.* at 233.  NASA and NASA-OIG argued that a

"representative" of NASA could be only "a representative of agency management—*i.e.*,

the entity that has a collective bargaining relationship with the employee's union."  *Id.* at

233–34 (internal quotation marks omitted).  They contended that because "[n]either

NASA nor NASA–OIG ha[d] such a relationship with the employee's union[,] . . . the

investigator in this case could not have been a 'representative' of the relevant 'entity.'"

*Id.* at 234.

The Court rejected this interpretation of § 7114(a)(2)(B) because the provision's

text was "not limited to investigations conducted by certain entities within the agency in

11

question," and all agreed that the relevant "agency" was NASA. *Id.* at 234 (brackets and internal quotation marks omitted). It held that "[i]n common parlance, the investigators employed in NASA's OIG are unquestionably 'representatives' of NASA when acting within the scope of their employment." *Id.* at 240.

Although there are potentially significant differences between *NASA* and our case, we will assume without deciding that AFOSI was functioning as a "representative" of Hill Air Force Base when conducting the interview of Ptacek. The question before us is the effect of § 7103(b)(1) and Executive Order 12,171 on Ptacek's rights during that interview. We now turn to those provisions.

### C.    Exclusion of AFOSI under Executive Order 12,171

Despite the mandate of § 7114(a)(2)(B), the FLRA held that Ptacek was not entitled to the presence of a union representative during his interview by the AFOSI. It relied on Executive Order 12,171, authorized by 5 U.S.C. § 7103(b)(1). We agree that the statute and executive order, read in context, unambiguously withdraw the *Weingarten* obligations from AFOSI investigations.

We begin with the statutory text. *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 218 (1991). Section 7103(b)(1) is broad:

> The President may issue an order excluding any agency or subdivision thereof *from coverage under this chapter* if the President determines that—
>> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>>
>> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

12

(emphasis added).  The plain language excludes covered agencies from every provision under the chapter.  There is no limiting language, for instance, that the agency would be subject to the provisions of § 7117 (relating to the duty to bargain in good faith) but not the provisions of § 7119 (relating to negotiation impasses).  This breadth appears in sharp relief when contrasted with the narrower scope of § 7103(b)(2).  Under that section the President may "issue an order suspending *any provision of this chapter* with respect to any agency, installation, or activity" outside the United States.  5 U.S.C. § 7103(b)(2) (emphasis added).  Under § 7103(b)(2) the President can pick and choose which provisions of the Labor-Management Statute should not apply to an agency, but under § 7103(b)(1) the President must exclude it from coverage under the *entire* statute or not at all.

Nevertheless, there is a potential ambiguity in the statute, depending on whose perspective to adopt in construing the statute.  The Union, naturally, looks at the matter from the employee's point of view.  The employee seeking to assert his *Weingarten* right is not an employee of the excluded agency.  He faces potential work-related discipline from his employing agency (here, Hill), not the excluded agency (here, AFOSI).  Why then should his representational rights be affected by the exclusion of that other agency from the statute?  As the Union puts it, "[A] covered agency [like Hill] . . . does not magically become uncovered simply because it happens to choose a tool [like the AFOSI] that [may] not itself be subject to [Labor-Management Statute] liability."  Aplt. Br. at 22.

13

The investigator, on the other hand, *is* part of the excluded agency and takes it as a given that the executive order means that the statute, including § 7114(a)(2), does not apply to his actions. And that being the case, there was no violation of the Labor-Management Statute by anyone—either the AFOSI investigator or Hill Air Force Base.

To resolve this conflict, we look to the statutory structure, context, and purpose. *See Brown*, 513 U.S. at 118 ("Ambiguity is a creature not of definitional possibilities but of statutory context."); *Harbert*, 391 F.3d at 1147 (traditional tools of statutory construction include "examination of the statute's text, structure, purpose, history, and relationship to other statutes"). It then becomes clear that an investigator from an excluded agency does not have any *Weingarten* obligations when acting within the agency's proper scope.

One strong indication that AFOSI's perspective is the proper one is that the focus of the statutory exception and the executive order is national security. Their function is to override the interests protected by the Labor-Management Statute when required by national security. Congress recognized the importance of certain employee rights by enacting the Labor-Management Statute. But by the same token it recognized that those rights may sometimes need to give way to national security, as determined by the President. In short, the employee's interests are subordinate in this context.

Further supporting this view is that the Union's interpretation would give the executive order no reasonable purpose and would undermine an important national-security purpose. To begin with, the purpose of § 7103(b)(1) and the executive order could not have been to exclude national-security investigators from the union-

14

membership and collective-bargaining provisions of the Labor-Management Statute. Such employees are already excluded from those provisions under § 7112(b)(6), which states that a potential bargaining unit is not appropriate for labor-organization representation if it includes "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." 5 U.S.C. § 7112(b)(6).

The Union argues that the exclusion could still have the purpose of exempting AFOSI employees who do not come under the § 7112(b)(6) exemption, such as clerical employees. But this purpose must satisfy the requirements of § 7103(b)(1), under which the President may exclude an agency only if the President determines that the "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, *and . . .* the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." (emphasis added). The Union utterly fails to explain how limiting the collective-bargaining rights of the nonexempt AFOSI employees could have been so important to this country's national security that President Carter would decide to include AFOSI in his executive order. Nor can we think of a good reason. We note that even without the Executive Order, § 7112(b)(6) exempts from statutory rights more than just AFOSI's investigators. Clerical employees may also be covered by the exemption. "[A]n employee is engaged in 'security work' within the meaning of [the exemption] if the employee's duties include 'the regular use of, or access to, classified information.'" *U.S. Dep't of Justice Washington, D.C.*, 62 F.L.R.A 286, 292 (2007). Perhaps a strike

15

by nonexempt employees could injure national security; but federal workers are prohibited from striking anyway. *See* 5 U.S.C. § 7311 ("An individual may not accept or hold a position in the Government of the United States . . . if he . . . participates in a strike, or asserts the right to strike, against the Government of the United States . . . ."); 18 U.S.C. § 1918 (violation of § 7311 is punishable by fine or imprisonment for up to one year).

On the other hand, the FLRA's interpretation of the statute has an obvious national-security purpose. Freeing AFOSI investigators from *Weingarten* restrictions when interviewing union members can serve two interests: (1) restricting access to national-security information that might otherwise be disclosed to union representatives attending investigatory interviews; and (2) obtaining greater cooperation in a national-security investigation from an interviewee who cannot gain psychological strength to resist by having a champion present during the interview. We recognize that there may be some (perhaps many) AFOSI interviews in which such interests are not served. But the statute does not permit the executive order to be finely tailored. The Union admitted at oral argument that under its interpretation of § 7103(b)(1) and the executive order, a Union member would *always* be entitled to have a representative present at an interview, no matter what the national-security interests at stake. As the Union sees it, there would be *no* way for the President to exclude AFOSI's national-security interrogations from *Weingarten* restrictions.

This is not to say that *Weingarten* rights are not important. Certainly they are. But they may need to yield to national-security interests. Congress allowed for that to

16

happen, and the President took the step. We conclude that the sole reasonable interpretation of § 7103(b)(1) and the executive order is that *Weingarten* rights are not available to union members during AFOSI investigations within the scope of its authority.

The relevant administrative and judicial precedents also support our interpretation. For instance, the Federal Circuit, in upholding the removal of an Air Force mechanic from his position because of marijuana usage, rejected a challenge to his questioning by the AFOSI without the presence of a union representative. *See Lawson v. Dep't of Air Force*, 215 F.3d 1347, 1999 WL 594536, at *1 (Fed. Cir. Aug. 6, 1999) (unpublished). It explained, "[A]n executive order clearly exempts Air Force OSI and other investigative agencies or subdivisions from [5 U.S.C. § 7114(a)(2)(B)]." *Id.* Likewise, in *U.S. Dep't of the Air Force, Air Force Materiel Command, Warner Robins Air Logistics Ctr., Robins Air Force Base, Georgia*, 66 FLRA 589, 593, 596 (Jan. 12, 2011) (ALJ Decision), an ALJ held that a threat by an AFOSI investigator during an interrogation was not an unfair labor practice because "it is clear that the [AFOSI] and those working within its authority are excluded from all requirements and limitations imposed by the [Labor-Management Statute] and not just certain provisions therein. Therefore, the General Counsel's argument that the inclusion of AFOSI in E.O. 12171 only excuses that subdivision from collective bargaining with its own employees must fail." And in *U.S. Dep't of the Air Force, Ogden Air Logistics Ctr., Hill Air Force Base, Utah*, FLRA ALJ Dec. Rep. No. 130, 1997 WL 798919, at *1 (Oct. 9, 1997), an ALJ rejected an unfair-labor-practice claim based on the refusal by AFOSI investigators to grant requests that union

representatives be present for interviews. Relying on Executive Order 12,171, the ALJ held that "[AFOSI] is excluded from coverage under the [Labor-Management] Statute, . . . [and] the requirements of § [7114] (a)(2)(B) may not be imposed on [AFOSI]." *Id.* at *8.

The Union urges that two previous FLRA decisions support its position. *See Lackland Air Force Base Exch., Lackland Air Force Base, Tex.*, 5 FLRA 473 (1981), and *U.S. Dep't of the Air Force, Ogden Air Logistics Ctr., Hill Air Force Base, Utah*, 36 FLRA 748 (1990). True, in both decisions the FLRA held that an Air Force employee had the right to union representation under § 7114(a)(2) during an examination by an AFOSI officer. But neither decision addressed whether § 7103(b)(1) and Executive Order 12,171 exempted AFOSI from complying with § 7114(a)(2). In fact, the alleged violation in *Lackland* occurred on July 14, 1979, more than four months before the issuance of Executive Order 12,171 on November 19, 1979. We therefore reject the assertion by the FLRA dissenting member in this case that "[t]he only credible explanation for the positions taken—and not taken—by the parties in *Lackland* is that all of the parties—and the [FLRA]—understood clearly that EO 12,171 and § 7103(b)(1) were not intended to preclude the AFOSI investigator from acting as a 'representative of the agency' when the investigator conducted the interview." *U.S. Dep't of the Air Force*, 68 FLRA at 467 (DuBester, M., dissenting). A better explanation is that the parties understood, if they had even noted the issuance of the executive order, that it did not apply to conduct occurring before its issuance. And the later decision in *Ogden Air Logistics Ctr.*, 36 FLRA 748, contains no mention of Executive Order 12,171 in either

18

the FLRA decision or the ALJ decision. In our view it is not entitled to any consideration on the issue before us.

Finally, we do not address whether an AFOSI interrogation would be exempt from 5 U.S.C. § 7114(a)(2)(B) if—as the Union argues could be the result of the FLRA's interpretation—the Air Force engaged AFOSI for routine employment disciplinary matters in order to systematically avoid the *Weingarten* right or if AFOSI acted outside the scope of its authority in conducting an investigation. The Union has not disputed, either before the FLRA or in the argument section of its opening brief on appeal, that AFOSI was acting within the scope of its authority in this case; and the FLRA reserved judgment on what would happen if AFOSI was operating outside the scope of that authority. *See* 68 FLRA at 464 ("[W]e note that there is no dispute that AFOSI was acting within the scope of its legal authority in this case, and nothing in our analysis in this case addresses situations where agencies use entities otherwise excluded from the coverage of the Statute by executive order to conduct investigations that are outside the scope of those entities' legal authority."). We leave the question for another day.

## III.    CONCLUSION

The petition is DENIED.

19

No. 15-9542, *American Federation of Government Employees v. FLRA*

**PHILLIPS**, Circuit Judge, dissenting.

The Labor-Management Statute—combined with President Carter's Executive Order 12,171 in response to it—excludes AFOSI's employees from coverage under the Labor-Management Statute.[1] This precludes even those AFOSI employees *not* directly working on national-security matters from having the right "to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them."[2] But nothing in the Labor-Management Statute or Executive Order takes the separate step of inserting the excluded AFOSI back into the Labor-Management Statute to defeat the rights of covered employees of other agencies. Those covered, non-AFOSI employees should retain the full scope of their coverage under the Labor-Management Statute.

The Labor-Management Statute unambiguously says that when a covered employee is examined by "a representative of the agency in connection with an investigation," that employee is entitled to have a union representative attend the examination if the employee reasonably believes the examination may result in discipline. 5 U.S.C. § 7114(a)(2)(B). By the same token, if the examining entity isn't the

---

[1] Although the Labor-Management Statute speaks of excluding agencies, its effect is really to exclude agency employees from coverage. That's why Congress declares that "[i]t is the purpose of this chapter [Labor-Management Relations] to prescribe certain rights and obligations of the employees of the Federal Government and to establish procedures which are designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b).

[2] These employee rights are first referenced at 5 U.S.C. § 7101.

employer agency's representative, an employee has no corresponding right to have a union representative attend. *Id.* In view of this, one would expect that the FLRA and the ALJ would have focused on whether, in examining Ptacek, AFOSI had acted as Hill Air Force Base's "representative" under § 7114(a)(2)(B). But the FLRA and the ALJ declined to answer that question.

Instead of answering that question, the FLRA took a shortcut. It decided that when President Carter excluded AFOSI from the Labor-Management Statute's coverage (again, preventing AFOSI's own employees from unionizing), he also intended to strip covered employees like Ptacek of their right to bring a union representative to AFOSI's examinations—*even if* AFOSI was acting as Hill Air Force Base's "representative" under 5 U.S.C. § 7114(a)(2)(B). This goes too far. The Executive Order excludes AFOSI employees only from organizing and collectively bargaining *their own* conditions of employment—it doesn't swing an AFOSI wrecking ball into covered employees' *existing rights* given by the Labor-Management Statute. Had President Carter intended to do that, I'd expect that he would have said so, especially when Congress has highlighted the societal benefits of affording the Labor-Management Statute's rights to the non-excluded workforce.[3]

Unfortunately, the majority follows the FLRA's shortcut. In doing so, I believe that the majority misconstrues what the Labor-Management Statute and Executive Order

---

[3] As part of its findings, Congress declared that the statutory protection of the right of employees to organize and bargain collectively "(A) safeguards the public interest, (B) contributes to the effective conduct of public business, and (C) facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1)(A)–(C).

mean when they speak of an agency's being excluded from coverage under the Labor-Management Statute. *See* 5 U.S.C. § 7103(b)(1); Exec. Order No. 12,171 § 1-1, 44 Fed. Reg. 66,565 (Nov. 19, 1979). The Executive Order's meaning is as plain as its consequences—AFOSI employees can no longer avail *themselves* of rights under the Labor-Management Statute. For instance, using the dispute in this case as a backdrop, the Executive Order precludes an AFOSI employee from unionizing and from ever bringing along a union representative to an examination the employee reasonably believes may result in disciplinary action. But that's a far stretch from saying that the Executive Order silently defeats covered employees' rights.

What, then, justifies the majority's view that the Executive Order impliedly repeals Ptacek's § 7114(a)(2)(B) right? National security, the majority says. It contends that unless the Executive Order impliedly repeals Ptacek's right under § 7114(a)(2)(B), covered-agency employees throughout government can insist that union representatives accompany them to all AFOSI examinations—even those raising national-security matters. At first glance, the majority's concern seems sufficiently serious to justify its riding to the rescue. But on a more careful second look, reading all of the statutory language together, the majority's national-security concern reveals itself as more imagined than real. In fact, the Labor-Management Statute already solves the majority's concern—it limits the employees' right to bring along a union representative to situations where the examining entity (here, AFOSI) is acting as the representative of the employer agency (here, Hill Air Force Base). That sets our course. In addressing the majority's national-security concerns, we then know to ask whether the investigating entity has

3

acted as the employer-agency's representative when examining a covered employee about a national-security matter. And, more particularly to our case, we know to ask whether AFOSI acted as Hill Air Force Base's representative in examining Ptacek about felony possession of child pornography, or about his accessing adult pornography on his work computer.

Although "representing whom?" is the most important question in the case, the FLRA and ALJ sidestepped it. We should remand for the FLRA to develop the record and decide that question. We should not simply "assume without deciding" that AFOSI indeed acted as Hill Air Force Base's representative. Majority Op. at 12. In making its national-security case, the majority apparently again assumes without deciding that a law-enforcement agency examining a covered employee about a national-security matter will necessarily be acting as the employer-agency's representative. That's hard to accept when a law-enforcement agency like AFOSI has its own, independent authority and responsibility to investigate national-security matters (or, as here, to investigate felonies having nothing to do with national security). The majority's "assuming but not deciding" approach short-circuits the needed analysis. By assuming that AFOSI acted as Hill Air Force Base's representative in examining Ptacek, the majority ignores what happens if AFOSI instead was representing itself. In that event, Ptacek would have no right to bring a union representative to the AFOSI examination, and he would lose his appeal.

It's wrong for the majority to "assume without deciding" that AFOSI examined Ptacek as Hill Air Force Base's representative. Because the FLRA didn't develop the record on this point, we have no basis to assume that. And on appeal the FLRA

4

acknowledges that the record isn't developed on the degree of collaboration between AFOSI and Hill Air Force Base. AFOSI may well have acted as Hill Air Force Base's representative in investigating Ptacek's accessing adult pornography on his work computer (that sounds like a personnel matter) but not have acted as Hill Air Force Base's representative when investigating felony child-pornography possession (a matter within its own jurisdiction to investigate), R. at 333–34. We need the FLRA to develop the record on those points.

By assuming but not deciding the "representative" issue, the majority leaves an unnecessary trail of "perhaps many" AFOSI non-national-security examinations at which covered employees will lose their § 7114(a)(2)(B) right to have a union representative attend.[4] Majority Op. at 16. For instance, here, the majority's unnecessary approach deprives Ptacek of his statutorily guaranteed union representation even if AFOSI switched gears during the examination to investigate him for accessing adult pornography at work—a personnel matter rather than a felony offense. I disagree with the majority that President Carter ever intended to strip covered employees of their § 7114(a)(2)(B) right as the cost of doing business to protect national security.

Nor do I think Congress or the President really need us doing their national-security job. If Congress or the President ever feel that national security demands the

_____

[4] AFOSI's authority extends well beyond investigating national-security crimes. For instance, AFOSI is responsible for non-national-security offenses such as assault and child endangerment; bad checks, forgery, and counterfeiting; bribery; computer crimes; drug offenses; firearm violations such as unlawful possession, discharge, or concealment; burglary; impersonation; improper use of government property; postal violations; robbery; sex offenses, and traffic offenses. R. at 333–38.

5

majority's result, either Congress or the President can exclude Hill Air Force Base (or any other agency) from the Labor-Management Statute's coverage. That neither Congress nor the President has done so speaks volumes. Perhaps both Congress and the President are comfortable that law-enforcement agencies are not an employer-agency's "representatives" when investigating felonies, including national-security violations. I think we shouldn't strain statutory language to solve a "problem" that Congress and a President could easily solve if they believe it really exists. We should leave the national-security work to the other two branches of government, where it belongs.

I disagree with the majority that any rival interpretation of the statute or Executive Order would be unreasonable. In analyzing why, the majority notes that, even before President Carter's Executive Order, the Labor-Management Statute already excluded "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." 5 U.S.C. § 7112(b)(6). From this, the majority concludes that the Labor-Management Statute already exempts all AFOSI investigators, and, in addition, all clerical employees engaged in "security work"—those clerical employees whose "duties include the regular use of, or access to, classified information." Majority Op. at 15 (quoting *U.S. Dep't of Justice Washington, D.C.*, 62 F.L.R.A. 286, 292 (2007)). Having gotten that far, the majority concludes that President Carter would not have included AFOSI in the Executive Order just to reach the remaining clerical employees. I see two problems with this approach.

First, as mentioned, AFOSI has broad authority to investigate a host of criminal offenses unrelated to national security. Based on the record before us, I can't tell whether

6

all of AFOSI's investigators even work on matters directly affecting national security. By excluding all AFOSI employees from the Labor-Management Statute's coverage, the Executive Order eliminates any potential challenge from any AFOSI investigator who doesn't work on matters directly affecting national security (perhaps, for instance, an investigator who exclusively investigates governmental thefts).

Second, I find it entirely plausible that the executive branch might have legitimate national-security concerns arising from the work that all AFOSI clerical employees do. Presumably, all clerical employees might at least occasionally have access to information bearing on national security since AFOSI works directly on national-security cases. After all, clerical employees type documents, store information, and converse with each other. For this reason, President Carter could reasonably have desired a blanket denial of the Labor-Management Statute's coverage to all AFOSI employees.

Finally, the majority supports its reading by contrasting the President's power to *wholly* exclude an agency located in the United States from the Labor-Management Statute's coverage with the President's power to suspend *any provision* of the Labor-Management Statute for agencies "located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security."[5] 5 U.S.C. § 7103(b)(2). I can't see how this matters. Granted, the President did wholly exclude AFOSI from the Labor-Management Statute. But this just means that AFOSI employees could no longer unionize or avail *themselves* of any of the

---

[5] The Executive Order excluded just one agency under this subsection, the Drug Enforcement Agency, Department of Justice.

7

Labor-Management Statute's benefits. It doesn't follow that just because President Carter intended to exclude AFOSI employees from unionizing, he also intended to limit the rights of covered, non-AFOSI employees.

I think the majority gives short shrift to *U.S. Dep't of the Air Force Ogden Air Logistics Ctr. Hill Air Force Base, Utah*, 36 F.L.R.A. 748 (1990). I agree that this decision didn't address "whether § 7103(b)(1) and Executive Order 12,171 exempted AFOSI from complying with § 7114(a)(2)." Majority Op. at 18. But why didn't it? I think we can fairly assume that by 1990 the FLRA knew full well about President Carter's 1979 Executive Order. And that being so, I think the most likely reason that the FLRA didn't address § 7114(a)(2) is that it reasoned that AFOSI's exclusion didn't operate to defeat covered, non-AFOSI employees' rights under the Labor-Management Statute. In view of that, I don't understand the majority's position that this decision is "not entitled to any consideration on the issue before us." Majority Op. at 19.

Nor am I persuaded by the majority's own cited cases. Illustrative is *Lawson v. Dep't of Air Force*, 215 F.3d 1347, 1999 WL 594536 (Fed. Cir. 1999) (unpublished), which the majority says "explained [that] 'an executive order clearly exempts Air Force OSI and other investigative agencies and subdivisions from [5 U.S.C. § 7114(a)(2)(B)].'" Majority Op. at 17 (alteration omitted) (quoting *Lawson*, 1999 WL 594536, at *1). The decision explains nothing, but, on our issue, simply offers the single conclusory sentence the majority quotes.

In sum, I believe the plain language of the Labor-Management Statute and Executive Order simply precludes AFOSI employees from availing *themselves* of the

8

benefits of Labor-Management Statute coverage. If Congress or the President ever believe that § 7114(a)(2)(B) imperils national security by affording a union representative at AFOSI examinations, Congress or the President can easily eliminate the threat—just exclude the employing agency from the Labor-Management Statute.